UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
LOUISVILLE DIVISION
CIVIL ACTION NO.  3:24-CV-00037-CHL

KEVIN W.,[1]                                                                    Plaintiff,

v.

COMMISSIONER OF SOCIAL SECURITY,                              Defendant.

MEMORANDUM OPINION AND ORDER

Before the Court is the Complaint filed by Plaintiff, Kevin W. ("Claimant").  Claimant seeks judicial review of the final decision of the Commissioner of Social Security ("the Commissioner").  (DN 1.)  Claimant and the Commissioner each filed a Fact and Law Summary and/or supporting brief.  (DNs 11, 11-1, 15.)  Claimant also filed a reply.  (DN 16.)  The Parties have consented to the jurisdiction of a Magistrate Judge to enter judgment in this case with direct review by the Sixth Circuit Court of Appeals in the event an appeal is filed.  (DN 7.)  Therefore, this matter is ripe for review.

For the reasons set forth below, the final decision of the Commissioner is **AFFIRMED**.

I.      BACKGROUND

On December 2, 2019, Claimant applied for disability insurance benefits under Title II ("DIB") and supplemental security income under Title XVI ("SSI").  (R. at 19, 91-92, 108-09, 125, 127, 129-30, 149-50, 169, 171, 276-97.)  His applications alleged disability beginning on October 29, 2019, due to post-traumatic stress disorder ("PTSD"), anxiety, depression, neck pain, back pain, traumatic brain injury ("TBI"), hypertension, and anemia.  (*Id.* at 19, 91-92, 108-09,

---

[1] Pursuant to General Order 23-02, the Plaintiff in this case is identified and referenced solely by first name and last initial.

129-30, 149-50, 185, 203, 1110.)  Claimant's applications were denied initially and again on reconsideration.  (*Id.* at 175-79, 185-87, 203-06.)

At Claimant's request, Administrative Law Judge ("ALJ") Neil Morholt ("the ALJ") conducted a hearing on Claimant's applications on March 24, 2021.  (*Id.* at 39-66, 220, 1202-29.) Claimant attended the hearing by telephone with his non-attorney representative.  (*Id.* at 19, 41, 173, 242-46.)  An impartial vocational expert also participated in the hearing.  (*Id.* at 41.)  The ALJ issued an unfavorable decision on May 5, 2021.  (*Id.* at 16-38, 1167-89.)  On July 2, 2021, the Appeals Council denied Claimant's request for review of the ALJ's decision.  (*Id.* at 5-10, 273-75, 414-19, 1190-95.)  Claimant subsequently requested and was granted an extension of time to pursue judicial review of the Commissioner's final decision.  (*Id.* at 1-4, 1235-38.)  Claimant timely-filed an appeal to the U.S. District Court for the Western District of Kentucky on September 3, 2021.  DN 1, *Kevin W. v. Comm'r of Soc. Sec.*, No. 3:21-cv-00556-CHB-CHL (W.D. Ky. filed Sept. 3, 2021).  The court remanded the case to the Commissioner of Social Security for further administrative proceedings on June 10, 2022, based on the Parties' joint motion for remand.  DN 23, *Kevin W. v. Comm'r of Soc. Sec.*, No. 3:21-cv-00556-CHB-CHL (W.D. Ky. ent'd June 10, 2022); DN 24, *Kevin W. v. Comm'r of Soc. Sec.*, No. 3:21-cv-00556-CHB-CHL (W.D. Ky. ent'd June 10, 2022).

On August 18, 2022, the Appeals Council vacated the final decision of the Commissioner and remanded the Claimant's case to the ALJ for resolution of two issues.  (R. at 1196-1201.) Specifically, the Appeals Council noted that while the ALJ indicated that he relied on the vocational expert's testimony in making his step five findings, the ALJ failed to properly resolve inconsistencies in the vocational expert's testimony.  (*Id.* at 1198 (citing *id.* at 32).)  The Appeals Council also noted that while the ALJ found the medical opinion of Angela Hublick, LCSW, that

Claimant "requires the assistance of a large service animal to engage in day-to-day community-based activities" to be "persuasive," the ALJ did not comply with the regulatory requirement that he discuss the supportability and consistency of the opinion. (*Id.* at 1199 (citing *id.* at 29).) On remand, the Appeals Council directed the ALJ to:

- Give further consideration to the claimant's maximum residual functional capacity during the entire period at issue and provide rationale with specific references to evidence of record in support of assessed limitations (Social Security Ruling 96-8p). In so doing, evaluate the medical source opinion(s) pursuant to the provisions of 20 CFR 404.1520c and 416.920c. As appropriate, the Administrative Law Judge may request the medical sources provide additional evidence and/or further clarification of the opinions (20 CFR 404.1520b and 416.920b). The Administrative Law Judge may enlist the aid and cooperation of the claimant's representative in developing evidence from the claimant's medical sources.

- Obtain supplemental evidence from a vocational expert to clarify the effect of the assessed limitations on the claimant's occupational base (Social Security Rulings 83-12, 83-14, 85-15 and 96-9p). The hypothetical questions should reflect the specific capacity/limitations established by the record as a whole. The Administrative Law Judge will ask the vocational expert to identify examples of appropriate jobs and to state the incidence of such jobs in the national economy (20 CFR 404.1566 and 416.966). Further, before relying on the vocational expert evidence the Administrative Law Judge will identify and resolve any conflicts between the occupational evidence provided by the vocational expert and information in the Dictionary of Occupational Titles (DOT) and its companion publication, the Selected Characteristics of Occupations (Social Security Ruling 00-4p).

(*Id.* at 1199.)

On remand, the ALJ conducted another hearing on Claimant's application on January 18, 2023. (*Id.* at 1137-66.)  Claimant attended the hearing via telephone with his non-attorney representative; an impartial vocational expert also participated in the hearing. (*Id.* at 1110, 1139, 1275-81.)  During the hearing, Claimant testified to the following.  He still has his service animal, a 190-pound dog, that assists him in walking and balancing and with anxiety and PTSD when he is out in public. (*Id.* at 1144-45.)  He testified that he had lost eighty pounds and was down from

about 302 at the last hearing to 232 due to changes in his diet and doing more walking.  (*Id.* at 1146-47.)  He testified that he walks his service dog daily at the park near his home.  (*Id.* at 1149.)  He has to sit on a bench at the park for five to ten minutes before walking back home.  (*Id.*)  He receives injections in his "sciatic, both sides, should[er], neck, back, knee, and foot."  (*Id.* at 1148.)  He is in mental health therapy and sees a therapist every week for anxiety, PTSD, social anxiety, and chronic military stress.  (*Id.* at 1149.)  He cannot watch television or be told "anything bad in the world."  (*Id.*)  It causes him anxiety and puts him into a state of isolation.  (*Id.*)  He doesn't do any household chores.  (*Id.* at 1150.)  He does not cook any meals for himself.  (*Id.*)

The ALJ issued a new unfavorable decision on April 4, 2023.  (*Id.* at 1107-36.)  Applying the five-step sequential evaluation process promulgated by the Commissioner to determine whether an individual is disabled, the ALJ made the following findings.  First, the Claimant had not engaged in substantial gainful activity since October 29, 2019, his alleged onset date.  (*Id.* at 1113.)  Second, Claimant had the following severe impairments: degenerative disc disease of the lumbar spine, degenerative disc disease of the cervical spine, degenerative joint disease of the knees, degenerative joint disease of the right shoulder, obesity, major depressive disorder, generalized anxiety disorder, attention deficit hyperactivity disorder ("ADHD"), and PTSD.  (*Id.*)  Third, Claimant did not have an impairment or combination of impairments that met or medically equaled any of the listed impairments in 20 C.F.R. Pt. 404, Subpt. P, App. 1.  (*Id.* at 1117.)  Fourth, Claimant had the residual functional capacity ("RFC") to perform light work with the following exceptions:

> he can occasionally climb ramps and stairs; he should never climb ladders, ropes, or scaffolds; he can occasionally balance, stoop, kneel, and crouch; he can never crawl; he can occasionally use foot controls bilaterally; he can occasionally push and pull with the bilateral lower extremities; he can occasionally reach overhead bilaterally; he can be frequently exposed to vibration, unprotected heights, and dangerous moving machinery; he can understand, remember, and carry out simple,

> routine tasks and instructions in a routine work setting having minimal variations and little independent judgment for extended 2-hour periods before the need for a regularly scheduled break; he can occasionally interact with supervisors and coworkers, but not involving tandem or group tasks; he can have no more than superficial work-related contact with the general public; tasks performed must be low stress, which is defined as no fast-paced production requirements or involving production quotas; he can adapt to occasional changes in a routine work setting; and he can make simple work-related decisions.

(*Id.* at 1120.)  Additionally at step four, the ALJ found that Claimant was unable to perform any of his past work as a cable installer.  (*Id.* at 1126.)  Fifth, and finally, considering Claimant's age, education, work experience, and RFC, there were jobs that existed in significant numbers in the national economy that Claimant could perform.  (*Id.* at 1127.)  The ALJ concluded that Claimant was not under a disability from October 29, 2019, through the date of his decision.  (*Id.* at 1128.)

Claimant subsequently requested an appeal to the Appeals Council, which denied his request for review on December 13, 2023.  (*Id.* at 1097-1106, 1299-1301.)  At that point, the ALJ's decision became the final decision of the Commissioner.  *See* 20 C.F.R. § 422.210(a) (2024); *see also* 42 U.S.C. § 405(h) (discussing finality of the Commissioner's decision).  Pursuant to 20 C.F.R. § 422.210(c), Claimant is presumed to have received that decision five days later.  20 C.F.R. § 422.210(c).  Accordingly, Claimant timely filed this action on January 19, 2024.  (DN 1.)

## II.    DISCUSSION

The Social Security Act authorizes payments of DIB and SSI to persons with disabilities.  *See* 42 U.S.C. §§ 401-434, 1381-1383f.  An individual shall be considered "disabled" if he or she is unable "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months."  42 U.S.C. § 423(d)(1)(A); 42 U.S.C. § 1382c(a)(3)(A); *see also* 20 C.F.R. §§ 404.1505(a), 416.905(a) (2024).

## A.      Standard of Review

The Court may review the final decision of the Commissioner but that review is limited to whether the Commissioner's findings are supported by "substantial evidence" and whether the Commissioner applied the correct legal standards.  42 U.S.C. § 405(g); *Key v. Callahan*, 109 F.3d 270, 273 (6th Cir. 1997).  "Substantial evidence" means "more than a mere scintilla"; it means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales*, 402 U.S. 389, 401 (1971).  The Court must "affirm the Commissioner's decision if it is based on substantial evidence, even if substantial evidence would also have supported the opposite conclusion." *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374 (6th Cir. 2013); *see Smith v. Sec'y of Health & Hum. Servs.*, 893 F.2d 106, 108 (6th Cir. 1989) (holding that if the court determines the ALJ's decision is supported by substantial evidence, the court "may not even inquire whether the record could support a decision the other way").  However, "failure to follow agency rules and regulations" constitutes lack of substantial evidence, even where the Commissioner's findings can otherwise be justified by evidence in the record.  *Cole v. Astrue*, 661 F.3d 931, 937 (6th Cir. 2011).

## B.      Five-Step Sequential Evaluation Process for Evaluating Disability

The Commissioner has promulgated regulations that set forth a five-step sequential evaluation process that an ALJ must follow in evaluating whether an individual is disabled.  20 C.F.R. §§ 404.1520, 416.920 (2024).  In summary, the evaluation process proceeds as follows:

(1)     Is the claimant involved in substantial gainful activity?  If the answer is "yes," the claimant is not disabled.  If the answer is "no," proceed to the next step.

(2)     Does the claimant have a medically determinable impairment or combination of impairments that satisfies the duration requirement[2] and

---

[2] To be considered, an impairment must be expected to result in death or have lasted/be expected to last for a continuous period of at least twelve months.  20 C.F.R. §§ 404.1509, 416.909 (2024).

6

significantly limits his or her physical or mental ability to do basic work activities? If the answer is "no," the claimant is not disabled. If the answer is "yes," proceed to the next step.

(3)    Does the claimant have an impairment that meets or medically equals the criteria of a listed impairment within 20 C.F.R. Part 404, Subpart P, Appendix 1? If the answer is "yes," the claimant is disabled. If the answer is "no," proceed to the next step.

(4)    Does the claimant have the RFC to return to his or her past relevant work? If the answer is "yes," then the claimant is not disabled. If the answer is "no," proceed to the next step.

(5)    Does the claimant's RFC, age, education, and work experience allow him or her to make an adjustment to other work? If the answer is "yes," the claimant is not disabled. If the answer is "no," the claimant is disabled.

20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4).

The claimant bears the burden of proof with respect to steps one through four. *Walters v. Comm'r of Soc. Sec.*, 127 F.3d 525, 529 (6th Cir. 1997). However, the burden shifts to the Commissioner at step five to prove that other work is available that the claimant is capable of performing. *Jordan v. Comm'r of Soc. Sec.*, 548 F.3d 417, 423 (6th Cir. 2008). The claimant always retains the burden of proving lack of RFC. *Id.*; *Her v. Comm'r of Soc. Sec*., 203 F.3d 388, 392 (6th Cir. 1999).

### C.    Claimant's Contentions

Claimant alleged that the ALJ erred in multiple ways in determining his RFC. First, Claimant argued that the ALJ's RFC was not supported by substantial evidence because the ALJ did not explain why no additional upper extremity limitations were included. (DN 11, at PageID # 1980, 1992-95; DN 16, at PageID # 2036-37.) Second, the Claimant argued that the ALJ erred in his evaluation of the opinion evidence of record, particularly the opinions of Angela Hublick, LCSW ("LCSW Hublick"); Geraldine A. Sasser, APRN ("APRN Sasser"); and consultative

7

examiner Kathy Seigler, Psy.D. ("Dr. Seigler").  (DN 11, at PageID # 1980, 1995-2001; DN 16, at PageID # 2038-41.)

### 1.    Upper Extremity Limitations

Claimant argued that the ALJ's determination of his RFC was not supported by substantial evidence because the ALJ should have included additional upper extremity limitations.  (DN 11, at PageID # 1980, 1992-95; DN 11-1; DN 16, at PageID # 2036-37.)  Specifically, Claimant argued that his degenerative disc disease of the cervical spine affected his ability to use his upper extremities such that the ALJ's failure to include any additional upper extremity limitations in his determination of Claimant's RFC or to explain why related limitations, such as handling and fingering, were excluded was erroneous.[3]  (DN 11, at PageID # 1092-95; DN 16, at PageID # 2036-37.)

An ALJ's RFC finding is the ALJ's ultimate determination of what a claimant can still do despite his or her physical and mental limitations.  20 C.F.R. §§ 404.1545(a)(1), 404.1546(c), 416.945(a)(1), 416.946(c) (2024).  The ALJ bases his or her determination on all relevant evidence in the case record.  20 C.F.R. §§ 404.1545(a)(1)-(4), 416.945(a)(1)-(4).  Thus, in making his or her determination of a claimant's RFC, an ALJ must necessarily evaluate the persuasiveness of the medical opinions in the record and assess the claimant's subjective allegations.  20 C.F.R. §§ 404.1520c, 404.1529, 416.920c, 416.929 (2024).  The ALJ must consider both severe and non-severe impairments in assessing a claimant's RFC.  20 C.F.R. §§ 404.1545(a)(2), 416.945(a)(2).  Here, despite Claimant's argument that the ALJ did not explain his reasoning regarding Claimant's

---

[3] Claimant also argued that the ALJ erred because "the ALJ did not find [Claimant] to have a severe right shoulder impairment, and he did not consider the residuals from [Claimant]'s surgery in crafting the RFC." (DN 11, at PageID # 1992.)  The Court finds this to be an inapposite argument because the ALJ *did* find Claimant to have a severe right shoulder impairment at step two: degenerative joint disease of the right shoulder.  (R. at 1113.)  For this reason and due to the ALJ's extended analysis of Claimant's ability to use his upper extremities—including the shoulder surgery referenced by Claimant—discussed *infra*, the Court finds Claimant's argument to be without merit.

ability to use his upper extremities, the ALJ's decision, read as a whole, thoroughly explains his findings and the basis for them.

Initially, at step two, the ALJ found Claimant's degenerative disc disease of the lumbar and cervical spines and degenerative joint disease of the right shoulder to be severe impairments that significantly limited Claimant's ability to perform basic work activities. (R. at 1113.) The ALJ found Claimant's claimed carpal tunnel syndrome and nerve damage, which related to his use of his hands and upper extremities, to be non-severe because there was no medical evidence to support it and Claimant's "allegations . . . [we]re not consistent with the record to any degree that they cause or contribute to his limitations." (*Id.* at 1114.) The ALJ summarized that records since late 2019 did not support "persistent related signs or symptoms even based on [Claimant's] own reports" and emphasized that Claimant had no treatment or work up for any such impairment since then. (*Id.* at 1117.) The ALJ noted that a 2019 EMG was inconclusive and that Claimant denied difficulties using his hands. (*Id.* (citing *id.* at 354, 481).) The ALJ concluded, "Any carpal tunnel or nerve symptoms thus appear mild and inconsistent with the need for limitations on the upper extremities." (*Id.* at 1117.)

Then, at step four, the ALJ found Claimant could perform light work with certain postural, environmental, and mental limitations including that Claimant could only "occasionally reach overhead bilaterally." (*Id.* at 1120.) Claimant correctly noted that the ALJ did not include any other specific limitations related to his use of his upper extremities, including handling and fingering limitations. (*Id.*) As support for his RFC determination, the ALJ cited to numerous pieces of evidence in the record. First, he explained of his conclusion generally that "[w]hile medical opinion evidence varie[d] a great deal, there remain[ed] too many inconsistencies to support the need for limitations beyond those allowed for" in his RFC. (*Id.* at 1121.) The ALJ

acknowledged the Claimant's testimony regarding neck and back pain spreading to his shoulders and legs, denial of doing most daily activities, right hand and arm pain stemming from a recent surgery, and inability to lift more than five pounds.  (*Id.*)  But the ALJ found that Claimant's testimony was inconsistent with the medical and other evidence of record.  (*Id.* at 1122.) Specifically regarding Claimant's daily activities, he noted that Claimant's description of his activities was inconsistent with descriptions of greater levels of activity described in Claimant's treatment records such that Claimant's testimony "was not persuasive."  (*Id.* at 1122 (citing *id.* at 348-56, 1424, 1520, 1539, 1891).)  Of the medical evidence generally, he summarized, "[T]he record as [a] whole including new evidence since the prior ALJ decision does not provide greater support for . . . limitations on the use of hands."  (*Id.* at 1123.)  He then pointed out a number of records in support of his explicit conclusion that no greater limitations were necessary.  When discussing Claimant's back and knee treatment, the ALJ noted that during his 2022 visit to his neurosurgeon, Claimant reported no numbness and tingling in his extremities and "no sensory, motor, or reflex deficits."  (*Id.* at 1124 (citing *id.* at 1520).)  Regarding Claimant's neck and upper extremity symptoms, the ALJ highlighted that Claimant had surgery on his right shoulder in February 2021 for which follow up records documented improvement "without any apparent complication."  (*Id.* at 1125 (citing *id.* at 1902).)  The ALJ noted that Claimant has had injections since his surgery but reported good relief.  (*Id.* at 1125 (citing *id.* at 1542).)  The ALJ also relied on opinion evidence in formulating his RFC.  He found the opinions of the state agency medical consultants persuasive, and none of those consultants had assessed Claimant to have any reaching, handling, fingering, or other limitations regarding his upper extremities.  (*Id.* at 1122 (citing *id.* at 102-04, 119-21, 142-45, 162-65).)  However, the ALJ noted that he added "some limitations in the [C]laimant's favor to account for . . . shoulder issues."  (*Id.* at 1122.)

10

To support his argument that greater limitations should have been imposed, the Claimant relied on opinion evidence from Dr. Gregory Schall, D.O., ("Dr. Schall"), but the ALJ found Dr. Schall's opinion unpersuasive. (*Id.* at 1122-23.) Dr. Schall completed a cervical and lumbar spine medical source statement at the request of Claimant's representative on November 22, 2019. (*Id.* at 422-28.) Dr. Schall opined the Claimant had reduced grip strength and could rarely lift greater than ten pounds. (*Id.* at 423, 427.) He confusingly checked a box that Claimant did not have "significant limitations with reaching, handling, or fingering" but also opined that Claimant had a fifty percent limitation on his ability to use his right hand and fingers to grasp, twist, and turn objects and perform fine manipulations due to bilateral carpal tunnel syndrome. (*Id.* at 427-28.) The ALJ found Dr. Schall's opinion not "well-cited as to actual exam or other objective evidence apart from Claimant's allegations of symptoms" and that no evidence from Dr. Schall or otherwise supported greater physical limitations than the ALJ included. (*Id.* at 1122.) In particular, the ALJ noted that Dr. Schall's opinion was based on only one or two visits over a limited period at which "physical exam findings appear[ed] completely unremarkable" except for Claimant's BMI. (*Id.* at 1122 (citing *id.* at 861-939).) The ALJ noted the inconsistency between Dr. Schall's opinion and the 2019 EMG findings discussed elsewhere in his opinion as well as the fact that Claimant has "had little or no related treatment and denied related symptoms since then." (*Id.* at 1122.) Claimant did not challenge the ALJ's discussion of Dr. Schall's opinion but merely pointed to it as evidence in support of a need for greater upper extremity limitations.

Based on the discussion summarized above, the Court finds that the ALJ more than supported his conclusion that no additional upper extremity limitations were necessary with substantial evidence. Contrary to Claimant's allegations of a lack of discussion, the ALJ included numerous pieces of evidence and explicit references to the fact that he did not believe greater upper

extremity-related restrictions were required. No further discussion was therefore necessary. Claimant has not cited the Court to evidence that the ALJ mischaracterized or otherwise selectively cited the record, and the Court is aware of none. Accordingly, Claimant's argument regarding any deficiencies in the ALJ's discussion of his RFC as it related to his upper-extremity restrictions is without merit, and the ALJ's discussion is supported by substantial evidence.

## 2. Opinion Evidence

Claimant also argued that the ALJ erred in his assessment of certain opinion evidence in the record, including those from his treating mental health providers, LCSW Hublick, and APRN Sasser, as well as consultative examiner Dr. Seigler. (DN 11, at PageID # 1980, 1995-2001; DN 11-1; DN 16, at PageID # 2038-41.) The applicable regulations set forth specific rules an ALJ must follow with regard to opinion evidence. Pursuant to 20 C.F.R. §§ 404.1520c, 416.920c, an ALJ "will not defer or give any specific evidentiary weight, including controlling weight, to any medical opinion(s)" in the record regardless of its source.[4]  20 C.F.R. §§ 404.1520c(a), 416.920c(a). Instead, an ALJ will evaluate the "persuasiveness" of a medical opinion by reference to the five factors listed in the regulation: supportability, consistency, relationship with the claimant, specialization, and other factors. 20 C.F.R. § 404.1520c(a), (c); 20 C.F.R. § 416.920c(a), (c). The regulations provide that the two most important factors are supportability and consistency and that an ALJ is required to "explain how [he or she] considered the supportability and consistency factors for a medical source's medical opinions." 20 C.F.R. § 404.1520c(a), (b)(2); 20 C.F.R. § 416.920c(a), (b)(2). However, the regulations state that "it is not administratively feasible for [an ALJ] to articulate in each determination or decision how [he or she] considered all of the factors for all of the medical opinions . . . in [the] case record"; thus, an ALJ is not required

---

[4] This language indicates that the new regulation has done away with the controlling weight and other old rules regarding the weight to be ascribed to medical opinions. 20 C.F.R. §§ 404.1527(c)(2), 416.927(c)(2) (2024).

to explicitly discuss how he or she weighed the factors of relationship with the claimant,[5] specialization, and other factors.[6]  20 C.F.R. §§ 404.1520c(b)(1)-(2), 416.920c(b)(1)-(2).  Where two medical opinions reach different conclusions but are "equally well-supported . . . and consistent with the record," an ALJ is required to state how he or she considered the other "most persuasive" factors in making his or her decision.  20 C.F.R. § 404.1520c(b)(3), 416.920c(b)(3).

The Sixth Circuit has not elucidated a specific standard to determine whether an ALJ sufficiently complied with the requirement to "articulate how [he or she] considered the medical opinions" and "explain how [he or she] considered the supportability and consistency factors" under the new regulations.  20 C.F.R. §§ 404.1520c(b), 416.920c(b).  *But see Adams v. Comm'r of Soc. Sec.*, No. 23-3284, 2023 WL 6366106, at \*2 (6th Cir. Sept. 28, 2023) (noting that the new regulations "substantially reduce[ ] the ALJ's obligation to explain the basis for his or her assessment of medical opinions"); *Deaner v. Comm'r of Soc. Sec.*, 840 F. App'x 813, 822 (6th Cir. 2020) (White, J. dissenting) (applying the new regulations and finding that "[t]he ALJ did not clearly analyze the supportability and consistency of the state consultants' assessments, as compared to other evidence in the record which supported [the plaintiff]'s claims").  However, district courts applying the new regulations within this circuit consistently apply the articulation requirement literally.  *See, e.g.*, *Hardy v. Comm'r of Soc. Sec.*, 554 F. Supp. 3d 900, 909 (E.D. Mich. 2021) ("The administrative adjudicator has the obligation in the first instance to show his or her work, i.e., to explain in detail *how the factors actually were applied* in each case, to each

---

[5] In assessing this factor, the regulations require an ALJ to consider the length of the treatment relationship, frequency of examinations, purpose of the treatment relationship, extent of the treatment relationship, and examining relationship.  20 C.F.R. §§ 404.1520c(c)(3), 416.920c(c)(3).

[6] The regulations provide that an ALJ will consider any "other factors that tend to support or contradict a medical opinion."  20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).  These factors include, but are not limited to, "evidence showing a medical source has familiarity with the other evidence in the claim," "whether new evidence [ ] receive[d] after the medical source made his or her medical opinion . . . makes the medical opinion . . . more or less persuasive," and whether the medical source has "an understanding of [the] disability program's policies and evidentiary requirements."  20 C.F.R. §§ 404.1520c(c)(5), 416.920c(c)(5).

medical source. Resorting to boilerplate language to support a finding of unpersuasiveness does not satisfy that obligation." (emphasis in original)); *White v. Comm'r of Soc. Sec.*, No. 1:20-CV-00588-JDG, 2021 WL 858662, at \*21 (N.D. Ohio Mar. 8, 2021) ("Although the new standards are less stringent in their requirements for the treatment of medical opinions, they still require that the ALJ provide a coherent explanation of [her] reasoning."); *Lester v. Saul*, No. 5:20-CV-01364, 2020 WL 8093313, at \*14 (N.D. Ohio Dec. 11, 2020), *report and recommendation adopted sub nom. Lester v. Comm'r of Soc. Sec.*, No. 5:20-CV-1364, 2021 WL 119287, at \*1 (N.D. Ohio Jan. 13, 2021) (finding that "the [new] regulations do require that the ALJ clearly explain his consideration of the opinions and identify the evidence supporting his conclusions").

The Court will consider below Claimant's arguments related to the opinions of LCSW Hublick, APRN Sasser, and Dr. Seigler.

### a)    LCSW Hublick's and APRN Sasser's Opinions

Claimant argued that the ALJ erred in his evaluation of the opinions of LCSW Hublick and APRN Sasser because the ALJ did not specifically address their opinions that he would need the assistance of a large service dog.  (DN 11, at PageID # 1980, 1995-98; DN 16, at PageID # 2036, 2038.)  He also argued that the ALJ's discussion of their opinions did not sufficiently address the supportability or consistency factors as required by the applicable regulations.  (DN 11, at PageID # 1996.)  LCSW Hublick and APRN Sasser were Claimant's treating mental health providers, seeing Claimant as a patient approximately once a week and once a month respectively beginning in 2018.  (R. at 801, 803, 1149-50.)  Both provided opinions regarding Claimant's functioning that the ALJ discussed in his decision.

LCSW Hublick provided several narrative statements about Claimant's functioning.  (*Id.* at 801-02, 1095-96, 1917.)  She explained that she had been seeing Claimant since April 2018 and

that he was being treated for generalized anxiety disorder and PTSD. (*Id.* at 801, 1095, 1917.) She opined that Claimant had social anxiety and "require[d] the assistance of a large service animal to engage in day to day community-based activities." (*Id.* at 81.) She observed that a large service animal seemed to help the Claimant more than a small one. (*Id.*) She stated that she supported the prescription of an emotional support animal because it minimized and assisted Claimant with "significant functional limitations in areas critical to navigating day to day responsibilities and social engagements" caused by anxiety. (*Id.* at 802; *id.* at 1095 ("[Claimant] faces challenges with social anxiety and has significant emotional distress when performing daily tasks . . . [that] has manifested in panic attacks and hospital visits."); *id.* at 1917 (opining that Claimant is "highly dependent on his service animal and natural support system to maintain a basic level of functioning").)

APRN Sasser completed a mental impairment medical source statement form on December 2, 2019. (*Id.* at 803-08.) She noted that she had been treating Claimant monthly since 2018. (*Id.* at 803.) When asked to "[d]escribe the clinical findings including results of mental status examinations that demonstrate the severity of your patient's mental impairments and symptoms," she wrote, "Mood—depressed and anxious, short term memory poor[,] patient has an emotional support animal that he has with him in public at all times (very large dog)." (*Id.* at 804.) Nowhere else in her statement did she mention the service dog. APRN Sasser also wrote a letter dated January 7, 2019, in which she noted that she prescribed Claimant an emotional support animal to mitigate symptoms he was experiencing including "limitations coping with what would otherwise be considered normal, but significant day to day situations." (*Id.* at 800.) But neither her letter nor her form contained any specific references to her clinical findings or diagnoses.

The ALJ found LCSW Hublick's and APRN Sasser's opinions, including statements supporting the need for a service dog, unpersuasive for the most part, noting that their opinions, "including statements supporting the need for a service animal, remain[ed] unsupported by objective medical evidence, inconsistent with the record overall, and unpersuasive for the most part." (*Id.* at 1123.)  The ALJ noted that LCSW Hublick's and APRN Sasser's opinions were not "well-cited as to actual exam or other objective evidence apart from the [C]laimant's allegations of symptoms, and there remains no new evidence from these or other sources to support marked mental limitations or similar mental or physical limitations beyond those allowed for above." (*Id.*) He summarized that generally Claimant's mental status exams were largely normal aside from anxiety, depression, and impulsiveness and that Claimant's mental health treatment remained mostly conservative.  (*Id.*)  Regarding LCSW Hublick specifically, he noted that her report cited only a few observed symptoms but emphasized that "her office ha[d] not made actual session notes available."  (*Id.*)  He also emphasized that he didn't find support for the few symptoms she said she observed from other providers in most contexts.  (*Id.*)  Regarding Claimant's use of a service animal specifically, the ALJ noted that treatment records "only rarely appear[ed] to reference the presence of his service dog, including his behavioral health medication check-ups, among other sources." (*Id.* (citing *id.* at 1930, 1936, 1941, 1945).)  He did acknowledge in his opinion that "in more stressful or demanding social settings or activities requiring greater levels of exertion," Claimant would need "more accommodation including a service animal for balance, emotional support, or other symptoms."  (*Id.* at 1123.)  But in his formulation of Claimant's RFC, the ALJ included a number of fairly strict restrictions related to Claimant's mental impairments, including several designed to limit Claimant's contact with supervisors, coworkers, and the general public. (*Id.* at 1120 ("[H]e can occasionally interact with supervisors and coworkers, but not involving

tandem or group tasks; he can have no more than superficial work-related contact with the general public; tasks performed must be low stress, which is defined as no fast-paced production requirements or involving production quotas; he can adapt to occasional changes in a routine work setting; and he can make simple work-related decisions.").)

As noted above, Claimant argued that this analysis was not sufficient to comply with the ALJ's regulatory duty to explain how he considered the supportability or consistency factors as to LCSW Hublick's and APRN Sasser's opinions. (DN 11, at PageID # 1995-98.) The supportability factor relates to the "objective medical evidence and supporting explanations presented by a medical source [] to support his or her medical opinion(s)." 20 C.F.R. §§ 404.1520c(c)(1), 416.920c(c)(1). The consistency factor concerns the relation of a medical source's opinion to "the evidence from other medical sources and nonmedical sources in the claim." 20 C.F.R. §§ 404.1520c(c)(2), 416.920c(c)(2). The Court finds that the ALJ's discussion was sufficient to comply with the regulatory requirements. As to supportability, LCSW Hublick refused to release her treatment notes for the ALJ's review, and the record does not appear to contain any treatment notes from APRN Sasser, only her opinions. Claimant cited no treatment notes in his brief with which he argued that LCSW Hublick's and APRN Sasser's opinions were supported. In the absence of those sources, it is unclear what else Claimant wanted the ALJ to do for supportability analysis and what else the ALJ could do besides evaluate the limited data provided in the opinions in the record and compare it to the other evidence of record. The ALJ's statement that those opinions were not "well-cited as to actual exam or other objective evidence apart from the [C]laimant's allegations of symptoms" was sufficient to comply with his regulatory duty under the circumstances. (R. at 1123.) As to consistency, the ALJ explicitly noted that LCSW Hublick's and APRN Sasser's "findings" were not consistent with other mental status exams in the record,

which typically showed more normal findings. (*Id.*) This too is sufficient particularly in view of the ALJ's discussion elsewhere in his RFC analysis of Claimant's mental health treatment generally. (*Id.* at 1125-26.) Claimant's brief provided no citation to records disputing this characterization of the record other than to LCSW Hublick's and APRN Sasser's opinions. And specifically as to Claimant's need for a service dog, it was relevant and sufficient under the applicable regulations for the ALJ to note that despite the prescription of a service dog and his testimony, the records did not consistently reflect him using one. (*Id.* at 1123.) Claimant cited no records besides LCSW Hublick's and APRN Sasser's opinions supporting the need for a service dog sufficient to undermine the ALJ's conclusion. Therefore, the Court finds no error in the ALJ's supportability or consistency analysis related to LCSW Hublick and APRN Sasser and finds the ALJ's discussion supported by substantial evidence.

### b) Dr. Seigler

Claimant also argued that the ALJ erred in his evaluation of the opinion of consultative examiner Dr. Seigler; specifically, Claimant argued that the ALJ's analysis did not sufficiently address the supportability factor as required by the applicable regulations and that he should have found the evaluation "well supported by clinical signs and findings." (DN 11, at PageID # 1999, 1980, 1998-2001; DN 16, at PageID # 2036, 2039-41.) Dr. Seigler examined the Claimant via telehealth on May 5, 2020. (R. at 793-99.) Dr. Seigler summarized Claimant's reports about his background, medical history, mental health history, and activities of daily living. (*Id.* at 793-95.) In her mental status exam notes, Dr. Seigler documented unremarkable motor activity; appropriate dress; normal attention and concentration; appropriate thought content; constricted facial expressions; normal eye contact; cooperative attitude; moderately low fund of knowledge; intact abstract reasoning and insight; good judgment; appropriate affect; dysphoric mood; slow and

slurred speech; normal volume, tone, and fluency; linear and goal-directed thought organization; normal decision-making skills; adequate coping skills; and adequate social maturity. (*Id.* at 795-96.) Dr. Seigler documented her diagnostic impressions as unspecified anxiety disorder and unspecific depressive disorder but recommended a more comprehensive assessment. (*Id.* at 796.) Based on her evaluation, Dr. Seigler opined that Claimant was markedly limited in his ability to tolerate the stress and pressure of day-to-day employment and moderately to markedly limited in his ability to sustain attention and concentration towards the performance of simple, repetitive tasks. (*Id.*) Dr. Seigler assessed no limitations on Claimant's ability to understand, remember, and carry out instructions towards performance of simple and repetitive tasks. (*Id.*)

In his opinion, at step three of his decision, the ALJ heavily relied upon and summarized Dr. Seigler's mental status findings in formulating his opinion regarding the paragraph B criteria. (*Id.* at 1118-19.) Then, at step four, the ALJ again summarized some of Dr. Seigler's findings, noting in particular the observations of slurred speech and that Claimant performed poorly on some of her testing. (*Id.* at 1125-26.) Addressing Dr. Seigler's opinion, he found it unpersuasive and unsupported by her examination findings and the overall record as a whole. (*Id.* at 1126.) He explained, "[A]ctual exam evidence at that point does not appear inconsistent for the most part with the ability to sustain at least the limited range of simple work with the social and other limits allowed for above." (*Id.* at 1126.) He noted that Dr. Seigler's exam documented normal attention, concentration, motor activity, and eye contact in particular. (*Id.*) However, he concluded that Dr. Seigler's moderate to marked and marked limitations in certain areas "appear[ed] too heavily based on the [C]laimant's subjective complaints at the time and inconsistent with the record otherwise." (*Id.*)

19

Claimant argued that this discussion did not comport with the ALJ's duty to discuss the supportability factor, characterizing what the ALJ did as failing to conduct a "proper persuasiveness analysis." (DN 11, at PageID # 1999.) He also criticized the ALJ for discounting Dr. Seigler's opinion merely because it was based on claimant's subjective reports, citing the fact that psychology is different than other areas in terms of the need to rely on a Claimant's subjective allegations. (DN 16, at PageID # 2039-40.) The Court finds these objections without merit. The ALJ's decision sufficiently addressed the supportability factor by highlighting the difference between her overall normal mental status findings and Dr. Seigler's opinion about Claimant's limitations. Notably, he did not reject Dr. Seigler's report merely because it relied on Claimant's allegations, he found it less than persuasive because it relied "too heavily" on Claimant's allegations. The cases cited by Claimant do not support that this was error. First, none of them are about whether an ALJ did a sufficient supportability analysis to comply with the applicable regulations. In fact, one of the cases he cited is not a social security case at all and wholly distinguishable for that reason. *See James v. Liberty Life Assur. Co. of Bos.*, 582 F. App'x 581, 589 (6th Cir. 2014). And while the others do support that assessing mental impairments is different, they also support that it is improper for an evaluator to rely too much on what a claimant says, which is exactly what the ALJ said Dr. Seigler did here. *See Kepke v. Comm'r of Soc. Sec.*, 636 F. App'x 625, 629 (6th Cir. 2016) ("The ALJ also properly discounted Dr. Chapman's opinion because it relied heavily on Kepke's self-reporting, and 'seemed to uncritically accept as true most, if not all, of what [Kepke] reported.' "); *Blankenship v. Bowen*, 874 F.2d 1116, 1121 (6th Cir. 1989) (quoting *Poulin v. Bowen*, 817 F.2d 865, 873-74 (D.C. Cir. 1987)) ("The report of a psychiatrist should not be rejected simply because of the relative imprecision of the psychiatric methodology or the absence of substantial documentation, unless there are other reasons to

question the diagnostic techniques.").  Here, the ALJ properly relied on the discrepancy between

Dr. Seigler's own exam findings, the other evidence in the record, and her opinion before rejecting

her opined serious limitations.  This was not error, and the Court finds the ALJ's explanation was

both accurate and sufficient to comport with the regulatory articulation requirement.

## III.    CONCLUSION AND ORDER

For the reasons set forth above, the final decision of the Commissioner is **AFFIRMED**.  A

final judgment will be entered separately.

Colin H Lindsay, Magistrate Judge

United States District Court

cc:     Counsel of Record

March 14, 2025